**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KRISTEN AUGITTO, derivatively on behalf of ZOETIS INC.,<br><br>Plaintiff,<br><br>vs.<br><br>KRISTIN C. PECK, WETTENY JOSEPH, PAUL M. BISARO, VANESSA BROADHURST, FRANK A. D'AMELIO, GAVIN D.K. HATTERSLEY, SANJAY KHOSLA, ANTOINETTE R. LEATHERBERRY, MICHAEL B. MCCALLISTER, GREGORY NORDEN, LOUISE M. PARENT, WILLIE M. REED, and MARK STETTER,<br><br>Defendants,<br><br>and<br><br>ZOETIS INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Kristen Augitto ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zoetis Inc. ("Zoetis" or the "Company"), files this Verified Shareholder Derivative Complaint against Kristin C. Peck ("Peck"), Wetteny Joseph ("Joseph"), Paul M. Bisaro ("Bisaro"), Vanessa Broadhurst ("Broadhurst"), Frank A. D'Amelio ("D'Amelio"), Gavin D.K. Hattersley ("Hattersley"), Sanjay Khosla ("Khosla"), Antoinette R. Leatherberry ("Leatherberry"), Michael B. McCallister ("McCallister"), Gregory Norden

1

("Norden"), Louise M. Parent ("Parent"), Willie M. Reed ("Reed"), and Mark Stetter ("Stetter") (collectively, the "Individual Defendants," and together with Zoetis, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zoetis, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Peck and Joseph. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zoetis, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zoetis' directors and officers from January 14, 2025, through May 6, 2026, inclusive (the "Relevant Period").

2. Zoetis is a Delaware Corporation with its principal executive offices located in Parsippany, New Jersey. The Company was founded in 2013 when its former parent company, Pfizer, spun off its Animal Health division. The Company is dedicated to the discovery, development, manufacture, and commercialization of vaccines, medicines, diagnostics, biopharmaceuticals, and digital solutions for pets and livestock.

3.      Throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, false and misleading statements surrounding the strength and expansion of products designed for dogs, cats, and horses (the "Companion Animal Portfolio"). Specifically, the Individual Defendants made or caused the Company to make statements portraying its Companion Animal Portfolio as a durable growth engine for the Company, driven by expanding markets, rising market share, and strong veterinarian adoption.

4.      For example, on January 14, 2025, while in attendance at the JP Morgan Healthcare Conference, Defendant Joseph shared that, "despite a decade of sustained robust growth we *continue to see substantial room to expand this market*."[1] In a later part of his discussion, Defendant Joseph stated, "[a]nd you saw us print 25% growth and *gain market share during that time.*" During the conference, Defendant Peck was asked about Librela, one of Zoetis' dominant products in its Companion Animal Portfolio, after a concerning safety warning issued by the United States Food and Drug Administration (the "FDA"). Defendant Peck asserted, "*what they were seeing is what we've been telling all of you. It's what's been in our global data…. It's been consistent with what we've been telling [veterinarians and pet owners] for the last year*."

5.      The truth fully emerged on May 7, 2026, when the Company issued a press release announcing its financial results for the period ended on March 31, 2026 ("Q1 2026 Press Release") which revealed stifled growth of the Companion Animal Portfolio resulting in dramatically reduced full-year guidance. Specifically, the Q1 2026 Press Release reported an 11% decrease in sales across the Companion Animal Portfolio in the Company's US segment, attributing this to "softer end-market demand" and "an increasingly competitive landscape." The Q1 2026 Press

---

[1] All emphasis has been added unless otherwise stated.

Release also lowered the Company's full year revenue guidance from $9.83 - $10 billion to $9.68 billion - $9.96 billion.

6.     On this news, the price of the Company's common stock dropped $23.91 per share or approximately 21.5%, from a closing price of $111.22 per share on May 6, 2026, to a closing price of $87.31 per share on May 7, 2026.

7.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and failed to disclose that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

8.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendants Peck and Reed engaged in improper insider sales, together netting proceeds of approximately $2.8 million.

10.     The Individual Defendants further breached their fiduciary duties by causing Zoetis to repurchase its own stock at artificially inflated rates. Indeed, between January 2025 and May 2026, over 28.7 million shares of Zoetis common stock were repurchased, costing the Company over $3.8 billion. Since the repurchased stock was only worth $87.31 per share, which

was the stock price at close of trading on May 7, 2026, Zoetis overpaid for repurchases of its own common stock by over $1.3 billion.

11.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Peck and Joseph's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) and 20(a) of the

Exchange Act (15 U.S.C. § 78j(b)), and SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Zoetis. Plaintiff has continuously held shares of Zoetis common stock since first purchasing common stock on October 11, 2016.

### Nominal Defendant Zoetis

18.     Zoetis is a Delaware corporation with principal executive offices at 10 Sylvan Way, Parsippany, New Jersey 07054. Zoetis common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZTS."

### Defendant Peck

19.     Defendant Peck has served as a Company director since October 2019 and as the Company's CEO since January 2020.

20.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Peck made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|---|---|---|---|
| February 19, 2025 | 382 | $156.68 | $59,852 |
| February 17, 2026 | 9,200 | $126.46 | $1,163,433 |
| February 17, 2026 | 10,800 | $127.55 | $1,377,531 |

Thus, in total, before the fraud was exposed, Defendant Peck sold 20,382 shares of Company common stock on inside information, for which she received approximately $2.6 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the schemes.

21.　　The Schedule 14A filed by the Company with the SEC on April 8, 2026 (the "2026 Proxy Statement") stated the following about Defendant Peck, in relevant part:

> Ms. Peck brings more than 25 years in business management, including 20-plus years in the health care and animal health industry to the Board. Her deep knowledge of Zoetis, beginning with its initial public offering in 2013, provides an invaluable perspective and critical link between the Board and management team's execution of strategic growth initiatives. Her strong business experience leading the company as Chief Executive Officer, as well as her history of success in development, implementation and execution of corporate strategy and executive management, make Ms. Peck a qualified and valuable member of the Board.
>
> Skills and Qualifications
>
> ***
>
> - Deep expertise in animal health, having paved the way for Zoetis as a public company and defining a global sector. Broad leadership experience spanning Zoetis' Global Manufacturing and Supply, Global Commercial Development, and its $2.9 billion U.S. Commercial Business groups.
>
> - Extensive experience in finance and innovation across several companies. Since becoming CEO of Zoetis in 2020, Ms. Peck delivered superior financial growth and industry-leading operating margins; launched 18 blockbuster products and

established a pipeline of 12 more potential blockbusters (products with expected future potential annual sales of $100M+).

- Strategic and innovative leader with experience in corporate strategy, business development, and digital transformation – including the acceleration of AI adoption and advanced analytics – which has been central to Zoetis' sustained growth and innovation since its IPO.

- Passion and commitment to life sciences and healthcare. Proven leadership in public policy and advocacy as past president of the Animal Health Institute and HealthforAnimals. Currently serves on the Board of Trustees of the Mayo Clinic, a top-ranked global medical center.

- Recognized for her transformative leadership in driving Zoetis' strong performance and innovation, Ms. Peck was named to TIME100 Most Influential People in Health for 2025; included on the CNBC 2024 Changemakers list; selected by Barron's as one of the top CEOs in 2022 and honored by Fortune as a 2020 Businessperson of the Year. Ms. Peck is a member of the board of directors of Business Roundtable (since January 2026). She previously served as a member of the board of directors of Thomson Reuters.

**Defendant Joseph**

22.    Defendant Joseph has served as the Company's CFO since June 2021.

23.    The Executive Team portion of the Company's website states the following about

Defendant Joseph:[2]

Wetteny Joseph is Executive Vice President and Chief Financial Officer of Zoetis, the world's leading animal health company and a member of the Fortune 500. In this role, he is responsible for overseeing the financial management, planning, operations and indirect procurement functions. Mr. Joseph also oversees the company's Human Health Diagnostics business. During his career, he has worked across diverse and complex businesses; led finance functions, business units, and business development; and managed relationships with stakeholders from customers and suppliers to investors.

Mr. Joseph joined Zoetis in June 2021, after 13 years in executive positions at Catalent, a global leader in pharmaceuticals, biologics and consumer health products. Before joining Zoetis, he was Senior Vice President and Chief Financial Officer of Catalent for three years, overseeing accelerated financial growth and value creation at the company through transformational acquisitions and organic

---

[2] https://www.zoetis.com/our-company/our-story/executive-team/wetteny-joseph

capital deployment. He first joined Catalent in 2008 as corporate Controller and held several senior finance positions until October 2015, when he was named President of the Clinical Supply Services business, responsible for $400 million in annual sales from the global business unit.

Before joining Catalent, Mr. Joseph held a variety of senior financial positions at the industrial distribution company HD Supply, including as Chief Financial Officer of its $1.2 billion plumbing and HVAC business unit. He also served as corporate Controller for Hughes Supply, a Fortune 500, NYSE-listed company that was acquired by Home Depot and became part of HD Supply. In his early career, Mr. Joseph spent six years at PricewaterhouseCoopers as an auditor and strategic financial advisor across a variety of industries.

Mr. Joseph holds both master's and bachelor's degrees in Accounting from Florida Atlantic University and is a Certified Public Accountant. Mr. Joseph is a member of the Executive Leadership Council and a member of the Federal Reserve Bank of New York's Second District Advisory Council.

**Defendant Bisaro**

24.    Defendant Bisaro has served as a director for the Company since May 2015. He also serves as a member of the Corporate Governance Committee and the Quality and Innovation Committee.

25.    The 2026 Proxy Statement stated the following about Defendant Bisaro, in relevant part:

Mr. Bisaro provides exceptional global healthcare and pharmaceutical industry expertise from his prior senior executive leadership roles, including as President and CEO of Actavis and Executive Chairman of Allergan, with deep knowledge of manufacturing processes, R&D, product liability and regulatory matters. He also contributes valuable strategic M&A acumen to the Board, supporting discussions on identifying potential growth opportunities and market expansion possibilities. His legal background as a former public company general counsel, combined with extensive public company board experience, contributes strong legal and governance expertise to the Board.

Skills and Qualifications

***

- Nearly 30 years of executive leadership experience in the pharmaceutical industry, having served as executive chairman, president and chief executive officer across multiple global pharmaceutical companies including Allergan plc (formerly Actavis plc) and Amneal Pharmaceuticals, Inc. (formerly Impax

Laboratories Inc.), demonstrating proven ability to lead complex organizations through periods of significant growth and transformation.

- Played a leading role in growing Allergan plc through, among other things, strategic M&A activity and served as Senior Vice President - Strategic Business Development, Chief Operating Officer and member of the Board of Directors at Barr Pharmaceuticals, Inc., bringing extensive deal experience and consistently identifying acquisition opportunities and market expansion possibilities to drive corporate growth.

- Deep expertise in pharmaceutical manufacturing operations and R&D processes, having been responsible for global manufacturing operations at Barr Pharmaceuticals, and R&D priorities that uniquely qualifying him for service on the Quality & Innovation Committee.

- Extensive public company board and governance expertise, currently serving on the Board of Directors of Myriad Genetics, Inc. and Keenova Therapeutics plc (formerly Mallinckrodt plc), with previous service on multiple pharmaceutical company boards, including Allergan plc (and its predecessor companies), Zimmer Biomet Holdings, Inc., Amneal Pharmaceuticals and TherapeuticsMD, Inc., and leveraging his legal background as former general counsel to provide valuable insights on corporate governance best practices and shareholder matters

**Defendant Broadhurst**

26.      Defendant Broadhurst has served as a Company director since July 2022. She also serves as a member of both the Corporate Governance Committee and the Quality and Innovation Committee.

27.      The 2026 Proxy Statement stated the following about Defendant Broadhurst, in relevant part:

Ms. Broadhurst provides critical public policy and government affairs expertise from her executive leadership role as Executive Vice President, Global Corporate Affairs at Johnson & Johnson, offering valuable insights on communications, brand reputation management, marketing and regulatory matters affecting the health industry. She brings extensive commercial experience from senior leadership roles across multiple pharmaceutical companies, including responsibility for global commercial strategy, M&A activity, pipeline development and new product launches. Her extensive government relations network, proven ability to navigate complex product challenges and political environments and governance acumen

from serving on a Fortune 500 executive team contribute a valuable perspective to Board deliberations.

Skills and Qualifications

***

Currently serves as Executive Vice President, Global Corporate Affairs at Johnson & Johnson, leading corporate marketing, government relations, global communications, public health and philanthropy functions, with previous responsibility as Company Group Chairman for Global Commercial Strategy for Pharmaceuticals, bringing deep expertise in public policy, brand reputation management and strategic communications. Additionally, she possesses expertise in corporate communications strategy, human capital management and an extensive network for advisor recommendations and strategic partnerships.

Extensive commercial and operational experience across the pharmaceutical industry, having served as President of Cardiovascular and Metabolism at Johnson & Johnson and General Manager of multiple business units at Amgen, with proven track record in pipeline development, new product launch strategy and leading M&A activity.

Provides valuable strategic counsel on navigating regulatory and political environments, drawing from experience managing complex product challenges, and serves as a trusted advisor to management on Washington D.C. policy matters, tariff exemptions and pharmaceutical industry positioning with both human and animal health applications.

## Defendant D'Amelio

28.     Defendant D'Amelio has served as a Company director since July 2012. He also a serves as a member of the Audit Committee and as the Chair of the Human Resources Committee.

29.     The 2026 Proxy Statement stated the following about Defendant D'Amelio, in relevant part:

Mr. D'Amelio provides unparalleled institutional knowledge of Zoetis, having been instrumental in conceptualizing and establishing the Company as a standalone entity from Pfizer. He brings exceptional financial acumen and extensive M&A expertise from his role as Executive Vice President and Chief Financial Officer of Pfizer, having led numerous acquisitions, partnerships and divestitures, including the transformative divestiture of the animal health business that created Zoetis. His pragmatism and deep operational experience overseeing global supply chains, information technology and major business transformations, combined with his

11

extensive public company board service, contributes an invaluable perspective to the Board.

Skills and Qualifications

\*\*\*

- As the former Executive Vice President and Chief Financial Officer of Pfizer Inc., as well as several other senior leadership roles, was responsible for Business Operations and Global Supply divisions, and finance, operations and strategic initiatives.

- Led acquisitions, partnerships and divestitures valued at nearly $200 billion during tenure at Pfizer, including transformative transactions such as the acquisition of Wyeth and the divestiture of the animal health business that created Zoetis, bringing unparalleled M&A expertise and a deep understanding of the company's history and strategic value proposition.

- Extensive operational expertise overseeing global supply chains, information technology functions and major business transformations, including large-scale technology implementations of enterprise risk management programs, with proven ability to provide pragmatic guidance on appropriate budgeting and transformative impact of major projects.

- Significant public company board experience, currently serving on the boards of directors of Humana Inc. (since 2003), Hewlett Packard Enterprise (since 2023) and Viatris Inc. (since May 2025), with previous service on the boards of Catalent Inc. and the National Advisory Board of JPMorgan Chase & Co., bringing extensive governance perspective

**Defendant Hattersley**

30.    Defendant Hattersley has served as a Company director since April 2024. He also serves as a member of the Audit Committee and as the Chair of the Corporate Governance Committee.

31.    The 2026 Proxy Statement stated the following about Defendant Hattersley, in relevant part:

Mr. Hattersley provides strong governance, unique insights and financial expertise from his experience as former director, President and Chief Executive Officer and Chief Financial Officer of Molson Coors Beverage Company. He contributes a unique perspective on brand matters and critical financial and strategic decisions, ensuring thorough Board oversight of Zoetis' growth strategy. His experience

navigating brand challenges and political environments additionally contributes significant leadership to the Corporate Governance Committee.

Skills and Qualifications

***

- In various senior executive and finance leadership roles at Molson Coors Beverage Company and MillerCoors, was very recently responsible for guiding the strategic and financial growth strategy of globally operating public companies. Contributes a dual CEO and CFO-informed approach to Board governance oversight and enhances discussions on strategic initiatives and financial discipline.

- Extensive financial management expertise spanning over 20 years, having served as chief financial officer of Molson Coors, MillerCoors, Miller Brewing Company and SAB Limited, with a proven ability to probe and provide rigorous oversight on complex finance and accounting matters, including debt financing and capital allocation strategies.

- Proven track record navigating complex brand reputation challenges and political environments at Molson Coors, providing valuable counsel on disclosure strategies, stakeholder communications and managing through periods of significant public scrutiny and administrative changes.

**Defendant Khosla**

32.     Defendant Khosla has served as a Company director since June 2013. He also serves as a member of the Human Resources Committee and the Quality and Innovation Committee.

33.     The 2026 Proxy Statement stated the following about Defendant Khosla, in relevant part:

Mr. Khosla provides extensive international business expertise from his senior leadership roles at leading consumer product companies, such as Mondelēz International and Unilever. With more than 35 years of experience in leadership roles at global food, beverage and consumer product companies, particularly in developing markets, he brings a deep understanding of global organizational dynamics, corporate culture, strategic prioritization and organizational performance to the Board.

Skills and Qualifications

13

***

- As Executive Vice President and President, Developing Markets of Mondelēz International, Inc., was responsible for leading transformative initiatives that grew a $5 billion business into a $16 billion business. Leadership included guiding manufacturing and supply, marketing and sales and M&A growth initiatives across developing markets.

- Deep expertise in international food, beverage and consumer product companies, including Mondelēz, Kraft, Fonterra and Unilever, with management responsibility over R&D, innovation and human capital management functions.

- Author and thought leader on corporate culture, strategic focus and organizational performance, having published "Fewer, Bigger, Bolder: From Mindless Expansion to Focused Growth," as well as numerous articles. Senior fellow and adjunct professor at Kellogg School of Management, Northwestern University. Additionally contributes insights from tenure as a strategic senior advisor for a number of management consulting firms.

- Extensive board experience having served on the boards of directors of Best Buy, Inc. and NIIT, Ltd, as well as currently serving on several private company boards of directors including the board of directors of Qualsights (since 2022).

**Defendant Leatherberry**

34.    Defendant Leatherberry has served as a Company director since December 2020. She also serves as a member of the Audit Committee and the Human Resources Committee.

35.    The 2026 Proxy Statement stated the following about Defendant Leatherberry, in relevant part:

> Dr. Leatherberry provides valuable technology implementation expertise from her 30-year career as a partner at Deloitte, with strong knowledge of change management and large-scale system transformations gained from working with Fortune 500 companies. She brings important perspective on employee culture and inclusion, demonstrating a track record of leading high-performing teams. Her expertise in cybersecurity, IT and governance contributes practical guidance on technology strategy.
>
> Skills and Qualifications

***

14

- Brings deep expertise in technology implementation and change management having worked with Fortune 500 companies on complex information technology transformations, strategy and implementation, data analytics, data strategy and operational issues during her 30-year career at Deloitte.

- Served as former President of the Deloitte Foundation and was responsible for recruiting strategies, hiring and workforce planning, providing a valuable perspective on human capital management matters, including culture and inclusion initiatives that create high-performing teams.

- Recognized technology and governance expert, named to the National Association of Corporate Directors (NACD) Directorship 100 in 2019 and 2020, having authored numerous articles and publications on information technology and governance and bringing practical guidance on large-scale technology implementations, cybersecurity matters and vendor relationships.

- Extensive board experience as current member of multiple private company boards of directors, including STRIVE (since 2022) and the American Family Insurance Mutual Holding Company (since 2020) and the advisory board of the Ellig Group (since 2022), and as member of the Widener University Board of Trustees and the Boston University Board of Trustees.

**Defendant McCallister**

36.    Defendant McCallister has served as a Company director since January 2013 and as the Chairman of the Board since June 2013.

37.    The 2026 Proxy Statement stated the following about Defendant McCallister, in relevant part:

> Mr. McCallister provides deep and pragmatic expertise in strategic planning, leadership and stability, management of complex issues and digital transformation from his senior executive leadership roles at Humana, a leading health and welfare services company. He has a proven track record of driving innovation-focused growth, leading strategic M&A initiatives and contributing valuable operational expertise. He also brings extensive corporate governance acumen acquired through his prior and current service on prominent public company boards.
>
> Skills and Qualifications

***

15

- As Chief Executive Officer of Humana, guided the company through significant expansion, responsible for the company's market capitalization increase from approximately $1.1 billion in 2000 to approximately $12.7 billion at the time of his retirement in 2012.

- At Humana, championed digital healthcare management systems, actionable information and customer-centric healthcare plans to deliver affordable and superior health-plan experiences, repositioning the company as an industry leader nationwide.

- Brings deep experience driving growth through strategic investments, having overseen major acquisitions such as CarePlus Health Plans and Concentra Inc., which expanded Humana's core business, adding over 300 medical centers in 42 states and $800 million in annual revenue.

- Extensive board experience having formerly served on the board of directors of National City Corp. and on the board of the Business Roundtable, where he was Chairman of its Health and Retirement Task Force.

**Defendant Norden**

38.     Defendant Norden has served as a Company director since January 2013. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance Committee.

39.     The 2026 Proxy Statement stated the following about Defendant Norden, in relevant part:

> Mr. Norden has over 20 years of leadership and financial management experience in global healthcare and pharmaceuticals. He provides exceptional financial and accounting expertise from his role as the former Chief Financial Officer of Wyeth, with comprehensive knowledge of reporting requirements, disclosure rules and audit committee responsibilities. He brings 13 years of institutional knowledge as chair of the Audit Committee, with extensive expertise in working with internal and external audit teams and navigating complex financial and compliance matters.
>
> Skills and Qualifications
>
> ***
>
> - Throughout his tenure at Wyeth, where he had broad responsibilities for many of the company's global functional areas and businesses, and later in his role as corporate CFO at Wyeth, he worked with a broad range of human and animal

16

health businesses, including Fort Dodge Animal Health, a manufacturer of animal health products, that was part of Wyeth, bringing a deep understanding of the industry to the Board.

- Audit and accounting expertise acquired from experience as Audit Manager at Arthur Andersen & Co., working primarily with multinational companies in the life sciences, consumer products and financial services industries, with a comprehensive knowledge of reporting rules, disclosure requirements and the critical role of external auditors.

- Deep expertise in creating and executing high impact strategic and operational global corporate initiatives, including as one of the lead architects/negotiators of the $68 billion Pfizer acquisition of Wyeth, which enhances Board discussions on major acquisitions and alliances and the Company's capital allocation strategy.

- Extensive board experience, currently serving on the board of directors of Praxis Precision Medicines and Royalty Pharma, as well as previous service on the boards of directors of Human Genome Sciences, Welch Allyn, Univision, Entasis, nanoString Technologies and Anthos.

**<u>Defendant Parent</u>**

40.    Defendant Parent served as a Company director from August 2019 through May 2026. She formerly served as the Chair of the Corporate Governance Committee and as a member of the Audit Committee.

41.    The Schedule 14A filed by the Company with the SEC on April 9, 2025 (the "2025 Proxy Statement") stated the following about Defendant Parent, in relevant part:

Career Highlights

- Brings deep experience in corporate governance and board matters, and in human capital management, compliance and risk management, gained during her tenure with American Express, where she worked extensively with the Audit, Compensation, and Nomination and Governance committees in her role as General Counsel

- Served as Executive Vice President and General Counsel of American Express Company, a global services company that provides consumer charge and credit card products and travel-related services, from 2004 to 2013

- Served as Of Counsel at the law firm of Cleary Gottlieb Steen & Hamilton LLP, from 2014 through 2021

- Led a number of M&A transactions and oversaw the legal function responsible for executing M&A transactions globally while at American Express

- Served on the Operating Committee and global management team of American Express from 2003 through 2013, was a member of the Board of American Express Centurion Bank through 2013 and served on the Supervisory Board of Deutsche Bank AG from 2014 to 2018

**Defendant Reed**

42.     Defendant Reed has served as a Company director since March 2014. He also serves as a member of the Corporate Governance Committee and as the Chair of the Quality and Innovation Committee.

43.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Reed made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
| --- | --- | --- | --- |
| March 11, 2025 | 1,210 | $166.14 | $201,029 |

Thus, in total, before the fraud was exposed, Defendant Reed sold 1,210 shares of Company common stock on inside information, for which he received approximately $201,029 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

44.     The 2026 Proxy Statement stated the following about Defendant Reed, in relevant part:

Dr. Reed is one of the preeminent voices in the animal healthcare space. He provides essential animal health industry expertise, bringing deep knowledge of both livestock and pet care sectors from his role as Dean Emeritus of Purdue University's College of Veterinary Medicine as well as from his extensive network and veterinary career spanning more than 40 years. He has an extensive background in veterinary diagnostics. He is an active leader and participant in industry conferences and is highly embedded within the veterinary community, providing valuable insights on veterinary workforce issues, industry trends and the evolving needs of future veterinarians. In addition, his focus on culture and employee engagement contributes important perspective to the Board.

Skills and Qualifications

***

- Currently serves as Dean Emeritus and Professor of Comparative Pathobiology at Purdue University's College of Veterinary Medicine, with more than 40 years of experience in animal health, diagnostics and veterinary medicine including roles at Michigan State University as Professor, Department Chair and Director of the Diagnostic Center for Population and Animal Health.

- Diplomate of the American College of Veterinary Pathologists and Charter Diplomate of the American College of Poultry Veterinarians, bringing specialized expertise in livestock veterinary medicine, particularly poultry and deep understanding of both the livestock producer perspective and broader veterinary community needs across pet care and livestock sectors.

- Highly engaged voice of animal health on the Board and in the veterinary industry, having served on a number of committees for the National Institutes of Health and the United States Department of Agriculture, and actively participating in industry conferences, providing valuable counsel on veterinary workforce issues, the role of the American Veterinary Medical Association and the current and future needs of veterinarians.

**Defendant Stetter**

45.    Defendant Stetter has served as a Company director since May 2025. He also serves as a member of the Human Resources Committee and the Quality and Innovation Committee.

46.    The 2026 Proxy Statement stated the following about Defendant Stetter, in relevant part:

Dr. Stetter provides comprehensive veterinary medicine expertise as Dean of the University of California, Davis School of Veterinary Medicine, which, combined

19

with his corporate experience from his senior leadership roles at The Walt Disney Company's Animal Kingdom, contributes valuable perspective on product strategy, competitive positioning and R&D pipeline development, with a focus on unmet market needs. His deep connections within the veterinary profession and understanding of what future veterinarians seek from pharmaceutical manufacturers contributes strategic insight to the Quality and Innovation Committee.

Skills and Qualifications

***

- Currently serves as Dean and Professor of the University of California, Davis School of Veterinary Medicine, overseeing all aspects of the school, including education, research, veterinary hospitals and animal health diagnostic labs, centers and institutes, having previously served as Dean and Professor at Colorado State University's College of Veterinary Medicine and Biomedical Sciences from 2012 until 2021.

- Unique combination of academic leadership and corporate experience, having held various senior roles at The Walt Disney Company, including Director of Animal Operations and Director of Animal Health, brings a practical business perspective and understanding of corporate decision-making as it relates to the Company's product positioning.

- Extensive experience across the full spectrum of veterinary medicine, having served as zoo and wildlife veterinarian at The Bronx Zoo/Wildlife Conservation Society and the Audubon Nature Institute, providing comprehensive perspective on animal health from companion animals to livestock to exotic species and wildlife, as well as leadership roles within national organizations, including serving as Director, PetSmart Charities Board, Treasurer for the American Association of Veterinarian Medical Colleges, President of the American College of Zoological Medicine, Chair for the Wildlife Scientific Advisory Board with Morris Animal Foundation and Chair of the research committee with the American Association of Zoo Veterinarians.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.    By reason of their positions as officers, directors, and/or fiduciaries of Zoetis and because of their ability to control the business and corporate affairs of Zoetis, the Individual Defendants owed Zoetis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zoetis in a

20

fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zoetis and its shareholders so as to benefit all shareholders equally.

48.    Each director and officer of the Company owes to Zoetis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zoetis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.    To discharge their duties, the officers and directors of Zoetis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zoetis, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zoetis' Board at all relevant times.

52.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53.     To discharge their duties, the officers and directors of Zoetis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zoetis were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Zoetis' own Code of Conduct (the "Code of Conduct").

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zoetis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Zoetis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zoetis' operations would comply with all applicable laws and Zoetis' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.    Each of the Individual Defendants further owed to Zoetis and the shareholders the duty of loyalty requiring that each favor Zoetis' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Zoetis and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, directorial, and controlling positions with Zoetis, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zoetis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

60.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zoetis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zoetis and was at all times acting within the course and scope of such agency.

## ZOETIS' CODE OF CONDUCT

63.     In the opening message of Zoetis' Code of Conduct, Defendant Peck states that the Company's success depends upon "[d]eliver[ing] our business results in compliance with all applicable laws and regulations" and that the Code of Conduct is "the starting point for putting our Core Belief of 'Always Do the Right Thing' into practice."

64.     In the section titled "Know Your Code of Conduct," under the heading "who must follow the code of conduct," the Code of Conduct states:

> Everyone who works at Zoetis must follow our Code of Conduct as well as our Corporate Policies and Procedures; this includes all colleagues, officers, and directors. Any waiver of the provisions of the Code of Conduct for executive officers may be made only by the Board of Directors.

We also expect anyone acting on our behalf to conduct themselves in a manner consistent with our Code of Conduct. This includes our relationships with third parties such as agents, consultants, contractors, distributors, suppliers, and vendors. Appropriate measures may be taken if a third party fails to meet our standards or their contractual obligations.

65.    In the section titled "Understand Your Responsibilities," the Code of Conduct

states, in relevant part:

- Always act in a professional and ethical manner. Be aware that your behavior reflects on our Company.

- Be familiar with the information contained in this Code of Conduct, our Corporate Policies and Procedures, as well as other policies and procedures that may apply to your role.

- Promptly report any suspected illegal or unethical behavior using any of the resources listed in this Code of Conduct.

- Remember, pressures or demands due to business conditions are never an excuse for violating the law, our Code of Conduct, or any Zoetis policy

***

**Additional Responsibilities of Zoetis Leaders**

Leaders and Supervisors have additional responsibilities to ensure that we meet our high standards of ethics and compliance:

- Lead by example and be a role model for ethical behavior

- Be a resource for others. Communicate to colleagues and our third parties who work with us how the Code of Conduct and policies apply to their daily work.

- Create an environment where honesty, integrity, and openness are valued and where everyone feels comfortable asking questions and reporting potential violations of the Code of Conduct and/or any Zoetis policy.

- Do your part to ensure that no one who speaks up suffers retaliation.

(Emphasis in original).

66.    In a section titled "Ask Questions and Report Concerns," under the subheading

"Accountability and discipline," the Code of Conduct states the following:

When a violation of this Code of Conduct, our Corporate Policies and Procedures, other Zoetis policies or procedures, or the law occurs, appropriate disciplinary action will be taken up to and including termination of employment. Certain actions may also result in legal proceedings, penalties, or criminal prosecution.

67. In a section titled "Conflicts of Interest," the Code of Conduct states the following, in pertinent part:

A conflict of interest can happen whenever you have a competing interest that may interfere with your ability to make an objective decision for Zoetis.

Each of us is expected to be proactive and, whenever possible, avoid situations that can lead to even the appearance of a conflict of interest. If you find yourself or members of your team in a potential conflict of interest situation, please disclose it to your manager and Corporate Compliance.

68. In a section titled "Animal Healthcare Laws and Regulatory Requirements," the Code of Conduct states the following, in pertinent part:

Zoetis follows all laws and regulatory requirements governing the research, development, manufacturing, distribution, marketing, government contracting, sale, and promotion of our products.

- As a global company, the laws and regulatory requirements of one country may apply to our activities in another country. When laws and regulatory requirements conflict, the stricter set of laws and regulatory requirements generally apply, with limited exceptions.

69. In a section titled "Product Quality and Safety," the Code of Conduct states the following:

Our customers rely on Zoetis for industry-leading product quality and safety. Understanding a product's safety profile, as well as its quality and performance characteristics, is essential.

Product quality and safety are extensively monitored during clinical studies; however, it is only after a product has been marketed and used in real-world conditions that its safety profile and performance characteristics can become more completely known. That's why Zoetis colleagues and the third parties we work with must share in the responsibility of reporting any safety, quality, or performance issues concerning our products.

- Report all adverse events and product issues. You may learn of product issues in many different ways: through telephone calls, letters, faxes, emails, websites, completed response forms from Zoetis-sponsored marketing programs, in meetings or casual conversations at work, or even in social settings.

- In addition, certain instances that may lead to increased risk of an adverse event, such as medication errors or product defects, should be reported. This reporting should still occur even if adverse events are not currently evident. We have a legal obligation to track and report these experiences and product quality complaints to regulatory authorities.

- Any information about a product issue must be forwarded to the local country pharmacovigilance team or local country regulatory manager within 24 hours.

70.    In section titled "Interactions with Animal Healthcare Professionals and Promotional Activities." the Code of Conduct states the following, in pertinent part:

We understand and follow the strict regulations that govern our promotional activities and our educational and commercial relationships with animal healthcare professionals. This includes our interactions with veterinarians; colleagues of veterinarian hospitals or practices; and those who administer, prescribe, purchase, or recommend prescription medications.

\*\*\*

- All promotional materials and communications must be accurate, not misleading, and compliant with all applicable legal and regulatory standards, including any applicable standards addressing substantiation, scientific rigor, and fair balance.

71.    In a section titled "Accurate Recordkeeping and Financial Reporting," the Code of Conduct states:

Investors, government authorities, and others rely on our accurate and complete business records and disclosures. Such information is also essential within the Company so that we can make informed business decisions.

Our books and records must be accurate, timely, complete, and in compliance with accepted accounting principles and our internal controls.

It is the responsibility of colleagues to report any unrecorded funds or assets, or false or artificial entries in the books and records of Zoetis. If you learn of or suspect accounting fraud, report it immediately by contacting a member of the Legal

28

function, the Compliance Office, the Internal Audit function, or our Controllers function.

Colleagues with a role in financial or operational accounting have a special responsibility in this area, but all of us contribute to the process of recording business results and maintaining records.

- Make sure that financial entries are clear and complete and do not hide or disguise the true nature of any transaction.

- Never record false sales or shipments or record them early, understate or overstate known liabilities and assets, or defer recording items that should be expensed.
- Do not maintain undisclosed or unrecorded funds, assets, or liabilities.

- Always comply with our Travel and Expense Policy, including being sure that expense reports are accurate.

- Always be accurate, complete, and truthful when submitting time sheets, research, quality, and safety results.

72.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage or cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**ZOETIS' AUDIT COMMITTEE CHARTER**

73.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). Under the section titled "Purpose," the Audit Committee Charter states the following:

29

The purpose of the Committee is to discharge the responsibilities delegated by the Board of Directors and to assist the Board of directors in fulfilling its responsibilities relating to: (a) the integrity of the Company's financial statements and the adequacy of its internal controls, (b) the Company's compliance with legal and regulatory requirements, (c) the independence, qualifications and performance of the Company's independent registered public accounting firm and (d) the performance of the Company's internal audit function.

In addition, the Committee shall oversee certain risk management activities as may be delegated by the Board of Directors. The Committee shall also prepare annually the report required by the rules of the SEC for inclusion in the proxy statement for the Company's annual meeting of stockholders.

74.     Under a section titled "Duties and Responsibilities," the Audit Committee Charter states the following, in pertinent part:

The following responsibilities are within the authority of the Committee, and the Committee shall fulfill these responsibilities, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, the NYSE or any other applicable regulatory authority.

*** 

**Financial Statements, Disclosures and Internal Controls**

**8. Internal Controls; Trends; Fraud.** Review with the independent registered public accounting firm, the Company's Internal Audit Department, and management: (a) the adequacy and effectiveness of the Company's systems of internal controls (including management's annual assessment of the adequacy and effectiveness of the such internal control and the related report issued by the independent auditors (as applicable), any significant deficiencies or material weaknesses in the design or operation of and any material changes in such internal controls reported to the Committee by the independent registered public accounting firm or management), accounting practices, and disclosure controls and procedures (and management reports thereon), of the Company and its subsidiaries, and the related report issued by the independent auditors; (b) current accounting trends and developments; (c) all critical accounting policies and practices to be used in the audit; and (d) any fraud, whether or not material, involving management or other employees who have a significant role in such internal control over financial reporting, and take such action with respect thereto as may be deemed appropriate.

**9. Financial Statements.** Review with management and the independent registered public accounting firm the annual and quarterly financial statements of the Company prior to their filing with the SEC, including: (a) any material changes in accounting principles or practices used in preparing the financial statements prior

to the filing of a report on Form 10-K or 10-Q with the SEC; (b) any "critical audit matters" (as defined under PCAOB standards) arising from the current period audit identified by the independent registered public accounting firm and/or management; (c) disclosures relating to internal controls over financial reporting; (d) the items required by applicable generally accepted auditing standards relating to the conduct of the audit of annual financial statements or review of interim financial statements; (e) the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's Form 10-K or 10-Q filed with the SEC and (f) the form of audit opinion to be issued by the independent registered public accounting firm on the annual financial statements.

**10. From 10-K**. Recommend to the Board of Directors, based on the review described in paragraphs 4, 5 and 7 above, whether the financial statements should be included in the annual report on Form 10-K.

**11. Earnings Releases.** Review and discuss with management and the independent registered public accounting firm (to the extent necessary) earnings press releases, including the type of information to be included and its presentation and the use of "pro forma", "adjusted" or other non-GAAP information (and its reconciliation to GAAP) as well as Company policies with respect to earnings press releases, financial information and earnings guidance, if any, provided to analysts and rating agencies (this function may be performed by the Chair of the Committee). Review the effect of alternative accounting methods on the Company's financial statements.

**12. Disclosures.** Review and discuss with management and the independent registered public accounting firm (to the extent applicable), the Company's internal procedures and controls related to key environmental, social and governance (ESG) external disclosures and reports, including any assurance or verification being provided by the independent registered public accounting firm or other third party with respect to such ESG disclosures.

***

**Risk Management and Compliance**

**14. ERM.** Oversee the Company's Enterprise Risk Management process, including reviewing with management the methodology by which enterprise risk assessment and management are undertaken.

***

**17. Compliance.** Review: (a) the status of the Company's compliance with laws, regulations, and internal procedures; and (b) the scope and operation of systems designed to promote Company compliance with laws, regulations and internal

procedures, through review of reports from management, legal counsel and third parties as determined by the Committee. Obtain and review from the applicable Company Compliance personnel reports on the Company's compliance program, and periodically review with management the implementation and effectiveness of the Company's compliance program.

**18. Complaints.** Establish and oversee procedures for the confidential and anonymous receipt, retention and treatment of complaints, including those regarding the Company's accounting, internal controls or auditing matters, concerns or any potential violations of Company policy or the law as well as for the confidential, anonymous submissions by Company employees of such concerns. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

(Emphasis in original).

75.    In violation of the Audit Committee Charter, Defendants Norden (as chair), D'Amelio, Hattersley, and Leatherberry violated the Audit Committee Charter by engaging in or permitting the Company to issue materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing the oversight of risks related to financial reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## ZOETIS' QUALITY AND INNOVATION COMMITTEE CHARTER

76.     The Company also maintains a Quality and Innovation Committee Charter (the "Quality and Innovation Committee Charter"). The Quality and Innovation Committee Charter describes the committee's purpose as:

> The purpose of the Committee is to discharge the responsibilities delegated by the Board of Directors and to assist the Board of Directors in fulfilling its responsibilities relating to: (i) the Company's compliance with systems and other legal and regulatory requirements related to manufacturing quality and environmental, health and safety matters, and those relating to research and development matters; and (ii) the Company's strategy, activities, results and investment in research and development and innovation initiatives.

77.     In a section titled "Duties and Responsibilities," the Quality and Innovation Committee Charter states, in relevant part:

> The following duties and responsibilities are within the authority of the Committee, and the Committee shall, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, the NYSE or any other applicable regulatory authority be responsible for:
>
> • **Compliance**. Periodically reviewing the adequacy of the Company's internal controls, policies, procedures and programs related to ensuring compliance with the applicable legal and regulatory requirements related to manufacturing quality and environmental, health and safety matters, and those relating to research and development matters.
>
> • **Supply/Manufacturing/Environmental**. Periodically reviewing the Company's organizational structure of the supply chain, manufacturing quality, and environmental, health and safety functions. Maintaining an informed status on manufacturing quality, and environmental, health and safety regulations applicable to the Company.
>
> • **Research & Development/Innovation**. Reviewing, evaluating and reporting to the Board of Directors regarding the Company's strategy, activities, results and investment in research and development and innovation initiatives, including the product review and approval/licensure process with regulatory agencies and any significant identified quality or regulatory issues related to the Company's research and development programs, to facilitate the Board's oversight of the Company's long-term innovation strategy and goals.
>
> • **Certain Programs**. Reviewing and discussing with management and reporting to the Board of Directors regarding the Company's programs with respect to: (i) animal care and welfare standards and practices utilized by or on behalf of the

Company; (ii) compliance with adverse event reporting requirements; (iii) product safety; and (iv) natural resources and sustainable manufacturing practices.

(Emphasis in original).

78.     In violation of the Quality and Innovation Committee Charter, Defendants Reed (as chair), Bisaro, Broadhurst, Khosla, and Stetter, violated the Quality and Innovation Committee Charter by engaging in or permitting the Company to issue materially false and misleading statements downplaying the impact of the FDA Letter; failed to adequately oversee the Company's product safety and animal welfare programs; and failed to ensure adequate internal controls relating to Zoetis' health and safety programs.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

79.     Beginning in 1952 as the Animal Agriculture division Pfizer (and later renamed Pfizer Animal Health), Zoetis has been a significant player in the animal health space for over seven decades. In 2012, Pfizer announced that their animal health division would become a standalone company, Zoetis. In February 2013, Zoetis completed its initial public offering on the NYSE and now stands as one of the largest animal health companies in the world.

80.     The Company's operations center around discovering, developing, manufacturing, and commercializing different approaches to companion and livestock animal healthcare needs. The Company's integrated approach to animal health focuses on the "Continuum of Care," reflecting a pursuit of healthcare solutions that predict, prevent, detect, and treat diseases.

81.     Zoetis maintains two major categories of products: the Companion Animal Portfolio and a portfolio directed towards use in livestock animals, namely cattle, swine, poultry, fish, and sheep (the "Livestock Portfolio"). The Livestock Portfolio made up approximately 29% of the Company's total revenue in 2025.

82.     The Companion Animal Portfolio is significantly larger than the Livestock Portfolio, making up approximately 70% of the Company's total revenue in 2025. Some of the top-performing products in the Companion Animal Portfolio include Librela, Apoquel, Cytopoint, and Simparica Trio, providing treatment for osteoarthritis pain (Librela) and dermatology issues (Apoquel and Cytopoint), and protecting against parasites (Simparica Trio). The growth in revenue attributable to these products largely hinges on veterinarian confidence and subsequent ordering of prescriptions, as these products must be prescribed by a licensed practitioner. Thus, veterinarian confidence is critical to the Company's demand, market share, and competitive positioning.

83.     Throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's substantial revenue growth and valuation, attributing these positives to the strength and expansion of the Company's Companion Animal Portfolio. However, contrary to these rosy assertions, in reality, the Company was facing serious issues with respect to both increased competition and veterinarian confidence in Zoetis' products. In September 2024, Elanco, a significant competitor to Zoetis, launched a new dermatology drug that competed head-to-head with Apoquel in clinical studies; notably, Elanco's drug maintained a lower price-point than the Company's dermatology treatments. Around the same time, Elanco launched another product to compete directly with Simparica Trio, also at a lower price point.

84.     Additionally, in December 2024, the FDA submitted a letter titled "Dear Veterinarian Letter notifying veterinarians about adverse events reported in dogs treated with Libreala (bedinvetmab injection)," warning veterinarians about the Company's osteoporosis pain treatment, Librela (the "FDA Letter").[3] The FDA Letter detailed the adverse outcomes witnessed

---

[3] https://www.fda.gov/animal-veterinary/product-safety-information/dear-veterinarian-letter-notifying-veterinarians-about-adverse-events-reported-dogs-treated-librela

for dogs treated with Librela including, "ataxia, seizures, [and] other neurologic signs, including but not limited to, paresis, recumbency, urinary incontinence, polyuria, and polydipsia" as well as death, including by euthanasia.

### False and Misleading Statements

#### January 14, 2025 JP Morgan Healthcare Conference

85.     On January 14, 2025, Defendants Peck and Joseph attended the JP Morgan Healthcare Conference on behalf of the Company. During the JP Mogan Healthcare Conference, Defendant Joseph touted the purported growth in the Company's dermatology segment, stating, in relevant part:

> We built the dermatology market initially with the launch of Apoquel. That was 11 years ago. And *despite a decade of sustained, robust growth, we continue to see substantial room to expand this market*. We're treating approximately 12 million dogs today for itch. Beyond that, there's 13 million dogs globally that are medicalized and are not receiving a prescription medicine for itch. In addition to that, there are 7 million dogs that are getting all the therapies like steroids. *As a market leader, we have a most differentiated set of products to meet the needs of pet owners and veterinarians*.

86.     During the conference, Defendant Peck also responded to a question about the FDA Letter, stating the following, in relevant part:

> We are super excited with the performance of Librela across 2024 . . . It's been the best launch ever in animal health, and we see significant value continuing there. We did get the Dear Vet letter, which I know some investors were surprised *we found terribly helpful actually*. . . . And again, *what they were seeing is that we've been telling all of you. It's what's been in our global data*. And what we found helpful is their recommendations in the end were what is in the international label. And so, this is what we've been sharing with you. So, obviously we are continuing to work with the FDA on getting a label update. Many people said we've obviously love that sooner rather than later, but I think investors, and more importantly for us veterinarians and pet owners, now have a better understanding what the FDA is seeing. And *it's been consistent with what we've been telling them for the last year*.

36

87.     Also during the conference, Defendant Joseph was asked about new market entrants. In response, he touted the Company's purported gain in market share and downplayed the risks such entrants would bring to the Company, stating:

> I think we're now showing, right, over the last 12 months or so, a year-and-a-half, in parasiticides, we face direct competition for Trio. And you saw us print 25% growth and *gain market share during that time*. And I think that's exactly 'what's going to happen every time. But I do think these products, when we launch them, we're very, very careful and deliberate about the profile we want to drive. And *we drive high level of satisfaction with these products over time*. And unless you have real differentiation, it makes it very, very hard to take over. *Now, there is room to expand and so 'we'll see more competition, but we're confident in our ability to continue to grow.*

*February 13, 2025 Earnings Call*

88.     On February 13, 2025, the Company hosted an earnings call to discuss its financial results for the quarter and fiscal year ended December 31, 2024 (the "Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Peck stated that despite the issuance of the FDA Letter only two months earlier, "*Librela's US launch is the most successful in our history*, cementing its blockbuster status in less than four quarters, and has quickly become the fourth largest product in our US pet care portfolio." When asked how veterinarians were responding to the Librela, Defendant Peck stated, "*We continue to do blind studies with veterinarians and they continue to be very satisfied with the product, and they continue to intend to prescribe*."

89.     Later during the Q4 2024 Earnings Call, Defendant Peck touted Zoetis' purported ability to expand its presence in the dermatology market due to strong customer satisfaction and brand loyalty. Specifically, Defendant Peck stated, in relevant part:

> In our key dermatology franchise, we grew revenue 17% operationally for the year. As we shared at JPMorgan, even with over 25 million dogs treated by our differentiated portfolio to curb itch, the total addressable market is projected to grow to $2.5 billion by 2028, an 11% CAGR. That's because there are still 20 million dogs worldwide who remain untreated or undertreated with a long runway for growth ahead. *A diverse, safe, and effective portfolio supported by strong*

*customer satisfaction, brand loyalty, and future long-acting formulation positions us to lead and expand the market,* and at the heart of our success is our commitment to living our purpose each day to nurture the world and humankind by advancing care for animals.

### February 27, 2025 Bank of America Securities Animal Health Summit

90.     On February 27, 2025, Defendant Joseph attended the Bank of America Securities Animal Health Summit on behalf of the Company. During his presentation, Defendant Joseph discussed the label update the Company had applied to Librela following the FDA Letter, stating:

> As we've talked about before, it's not uncommon to see label updates within the first couple of years of our product launch. And certainly, *we expected to have label updates* and we've had them in other markets as well across our international offerings, in Canada, UK, Switzerland and so forth. So, having a label update here in the US was certainly not unexpected and it's *in line with what we expected*, which is great. So, it's good to have it finalized and have the official approval from the FDA. It's not that if – label changes can't happen any other time during a product lifecycle, but it tend to happen more consistently in the first couple years. And in terms of what this has done, the finality on that is great because it creates that for our vets and our field force, quite frankly, who had a lot more discussion around, well, adverse events that are on this label versus that one, et cetera, and now that's effectively behind us. *And it's been received, well-received from our customers and consistent with what we told them to expect.*

### March 11, 2025 Barclays Global Healthcare Conference

91.     On March 11, 2025, Defendant Joseph attended the Barclays Global Healthcare Conference on behalf of the Company. When discussing feedback from veterinarians on Librela, Defendant Joseph stated, in pertinent part:

> *[I]t's been met with very positive feedback from vets and very consistent with what we've been saying to them for the last several months in terms of what we expect to happen. And that level is also very consistent with labels that we have elsewhere in other markets.*

92.     Regarding the market for dermatology products, Defendant Joseph stated the following, in relevant part:

> [W]hen you look at derm, for example, that's been around for over a decade with Apoquel. We still have more medicalized dogs globally that are not treated than

38

that are treated with our product. ***So we think there's substantial [opportunity] to continue to expand those***.

***April 9, 2025 Proxy Statement***

93.     On April 9, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

94.     The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect twelve directors until the 2026 annual meeting of the stockholders; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the selection of KPMG as the Company's independent registered accounting firm for 2025.

95.     Regarding the "Board's Role in Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

**Enterprise Risk Management**

As one of its primary responsibilities, the Board as a whole and through each of its Committees oversees the Company's management of risk, including our Enterprise Risk Management ("ERM") program. Our ERM program is designed to identify, assess and mitigate risks through a quantitative and qualitative assessment strategy that considers the nature and immediacy of a particular risk, as well as the likelihood of a risk occurring, and is evaluated and refreshed on an annual basis. Our Senior Vice President, Global Risk and Finance Excellence, who reports to our Executive Vice President and Chief Financial Officer, is responsible for overseeing our ERM program and regularly reports on our ERM program to the Audit Committee and reports to our full Board at least twice a year. In addition, our Chief Audit Executive, who oversees our Internal Audit function, our Chief Compliance Officer and our Controller also participate in the ERM program to ensure that appropriate disclosure controls and procedures are in place based on the risks identified by the ERM program. Our Chief Audit Executive and Controller report to the Audit Committee at every Audit Committee meeting.

Management, including our Senior Vice President, Global Risk and Finance Excellence, Chief Audit Executive, Chief Compliance Officer and Controller, provides regular reports to the Board, the Audit Committee, and our executive team

on the areas of material risk to the Company, and the Board discusses with management the Company's major and emerging risks, including financial, operational, technological, privacy, cybersecurity, data and physical security, disaster recovery, legal and regulatory.

Zoetis undertakes a comprehensive annual quantitative and qualitative evaluation of potential risks maintained and updated in a customized risk register that defines and categorizes each of these risks. Each risk is rated as critical, high, medium or low, based on potential impact and likelihood of the risk in its inherent or unmitigated state and residual or mitigated state. The comprehensive annual evaluation is led by the Zoetis ERM Task Force, a cross-functional group of key Zoetis enterprise leaders. The mitigation plans for risks rated "critical" and "high" are subject to continuous monitoring. The status of these risks, and effectiveness of the mitigation plans are evaluated and updated by the Zoetis Executive Team on a quarterly basis.

As needed, our management, Board and Committees consult with outside advisors to assess risk identification and mitigation, including the anticipation of future threats and trends. In addition, the Board and its Committees regularly review the Company's strategy, finances, operations, legal and regulatory developments, research and development, manufacturing quality and competitive environment, as well as the risks related to these areas.

**Committee Oversight**

The Board utilizes its Committees to directly oversee certain key risks. Each Committee provides regular reports to the full Board regarding their areas of responsibility and oversight. We believe that our Board's active role in risk oversight, including at the Committee level, supports our efforts to manage areas of material risk to the Company.

*** 

**Audit Committee**

- Oversees the management of risks related to financial reporting, information security risks (including cybersecurity), and regulatory compliance

- Oversees the annual internal audit risk assessment, which identifies and prioritizes risks related to the Company's internal controls in order to develop internal audit plans for future fiscal years

***

**Quality and Innovation Committee**

40

- Oversees risks related to natural resources and climate, manufacturing quality and environmental, health and safety matters

- Oversees risks associated with our strategy and investments in research and development and external innovation

96.    Regarding the Company's Code of Conduct, the 2025 Proxy Statement stated:

All of our directors and colleagues, including our CEO, Chief Financial Officer, and Controller, are required to abide by our policies on business conduct to ensure that our business is conducted in a consistently legal and ethical manner… We will promptly disclose any future amendments to, or waivers from, provisions of this Code affecting our directors or executive officers on our website as required under applicable SEC and NYSE rules.

97.    Regarding the Company's Audit Committee, the 2025 Proxy Statement listed its

primary responsibilities as follows:

- Oversees the integrity of our financial statements and system of internal controls

- Sole authority and responsibility to select, determine the compensation of, evaluate and, when appropriate, replace our independent public accounting firm

- Oversees the performance of our internal audit function

- Oversees our risk management programs, including information security (which includes cybersecurity) and data privacy

- Reviews reports from management, legal counsel and third parties (including our independent public accounting firm) relating to the status of our compliance with laws, regulations and internal procedures

98.    Regarding the Company's Quality and Innovation Committee, the 2025 Proxy

Statement listed its primary responsibilities as follows:

- Evaluates our strategy, activities, results and investment in research and development and innovation

- Oversees compliance with processes and internal controls relating to our manufacturing quality and environmental, health and safety ("EHS") programs

- Reviews organizational structures and qualifications of key personnel in our supply chain, manufacturing quality and EHS functions

- Oversees our programs with respect to animal welfare, adverse event reporting and product safety matters

99.    The 2025 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

100.    The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

101.    As a result of Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia,* to: (1) elect Defendant Stetter and re-elect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the

compensation of the Company's named executives; and (3) ratify KPMG as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2025.

*May 6, 2025 Q1 2025 Earnings Call*

102. On May 6, 2025, the Company held an earnings call to discuss its financial results for the period ended on March 31, 2025 ("Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Joseph highlighted Simparica Trio's purported growing market share, stating:

> Across the portfolio, alternative channel sales continued to outpace the vet channel, offering greater convenience for pet owners, improving compliance and stickiness. Driven by strong growth in auto ship programs that boost compliance and increase the lifetime value of each dog on treatment, our Simparica franchise posted 17% US growth this quarter on $260 million in revenue. Additional competitive entrants are accelerating the market's shift to triple combinations *where we continue to gain share*, thanks to the strength of our field force, our first mover advantage, and ongoing innovation, including expanded label claims.

103. Also during the Q1 2025 Earnings Call, Defendant Joseph boasted of the purported demand from veterinarians for Librela and Solensia, stating: "*we remain confident in the sizable market potential*. Our foundation is solid and *record penetration confirms that veterinarians want better [osteoarthritis] solutions.*"

104. During the question-and-answer session of the Q1 2025 Earnings Call, Defendant Peck was asked about price competition and other competitive pressures. Defendant Peck responded:

> We have an excellent product. *It's continued to compete really well in the market*. We're really proud of the execution on this in the US and around the globe. So, we've seen competition. We're obviously going to see more competition. I think what's also something to focus on is that right now we have a 40% share in puppies and obviously, once one dog goes on a product, it's rare that it'll switch. So, I think that's a really good indication of where that's going in the future.

105. Later during the question-and-answer session of the Q1 2025 Earnings Call, Defendant Joseph continued to tout Librela's alleged strong approval from veterinarians, stating:

I think if you look at the performance of Librela, first of all, just to see just how much interest there is in terms of vets looking for solutions for [osteoarthritis] pain, you saw 86% penetration across clinics. And *we continue to see very strong satisfaction levels for vets who are using the product*.

*May 22, 2025 BNP Paribas Animal Health Day*

106.    On May 22, 2025, Defendant Joseph attended the BNP Paribas Animal Health Day on behalf of the Company. During the event, Defendant Joseph discussed Zoetis' dermatology products, including Apoquel, and stated that "[t]his is not [a market] where we are sitting and waiting to see what the competition does. *This is a market that we've led for a long time and we intent to continue to lead*."

107.    An analyst at the event asked Defendant Joseph about veterinarian feedback following the updates made to the Librela label after the release of the FDA Letter. Defendant Joseph responded, stating, in pertinent part, that "our conversations, and I know our investors do quite a bit of channel checks and talk to vets as well, continues to be that *the satisfaction level with the products is very strong.*"

*May 29, 2025 Stifel Jaws & Paws Conference*

108.    On May 29, 2025, Defendant Joseph attended the Stifel Jaws & Paws Conference on behalf of the Company. During the event, Defendant Joseph was asked about competition from new market entrants, to which he responded the following, in relevant part:

[A]s others launch products and are doing more DTC and more awareness for triple combinations, *you'll continue to see that drive the overall market. We've been gaining patient share in this space for quite some time.* It has helped what is a very broad portfolio of parasiticides that we have, but it's helped us to really gain in position from fifth globally to second globally. And so, we continue to be very, very pleased with how Trio is performing. We're 25% in the first year of competition from the player that is actually global leader in parasiticides.

*June 3, 2025 William Blair Growth Stock Conference*

109. On June 3, 2025, Defendant Joseph attended the William Blair Growth Stock Conference on behalf of the Company. During the conference, Defendant Joseph discussed the parasiticides market within which Zoetis sells products such as Simparica Trio. Specifically, Defendant Joseph stated, in pertinent part:

> [O]n parasiticides, there are close to 90 million dogs in the US, and I know I'm speaking US largely, but the opportunities are even more vast if you think outside the US, based on where we are in terms of medicalization rates. But if I were to use some of the stats in the US, almost 90 million dogs, only about a third on prescription parasiticides. And of those, a third of those are on triple combination. So, ***the opportunity to continue to expand triple combinations is really significant***, and we're still talking about two-thirds that are not on prescription and only a third total on parasiticides. So, ***you're going to continue to see the growth of that end of the market for quite some time in expanding.***

110. Later during the conference, Defendant Joseph continued to tout the Company's purported competitive positioning in the pesticides market, stating, in relevant part:

> The question is ***who's going to get the most of the expansion opportunities that exist***, which is why we started talking a lot about how ***we're getting a higher share of puppies getting on our products*** than our overall share of dogs or adult dogs, if you will… We grew 25% in the first year of head-to-head competition against our triple combination with, we believe, a superior label for our product, which goes back to the other point that I was making.

111. The statements contained in ¶¶ 85-92 and 102-110 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*August 5, 2025 Press Release and Earnings Call*

112.    The truth began to emerge on August 5, 2025, after the market closed, when the Company issued a press release announcing its financial results for the period ended June 30, 2025 ("Q2 2025 Press Release"). Although the Q2 2025 Press Release reported a rise in the Company's full-year revenue as well as adjusted profit guidance following better-than-expected quarterly results, the Q2 2025 Press Release revealed weaking demand trends within the Company's Companion Animal Portfolio.

113.    On this news, Zoetis' stock price fell $5.69 per share, or approximately 3.8%, from a closing price of $151.81 per share on August 4, 2024, to close at $146.12 per share on August 5, 2025.  However, the Individual Defendants continued to obfuscate the truth surrounding Zoetis' competitive position and long-term growth prospects.

114.    For example, later that same day, the Company held an earnings call to discuss the financial results reported in the Q2 2025 Press Release (the "Q2 2025 Earnings Call"). During the call, the Individual Defendants attempted to quell investor concern about Zoetis' competitive positioning and market-share strength, emphasizing that, "*our key franchises have significant runway for continued, durable growth,*" that Simparica Trio was "*setting the standard of care,*" and that "*[Simparica] Trio remains the trusted first choice for veterinarians and pet owners alike.*"

115.    Also during the Q2 2025 Earnings Call, the Individual Defendants further claimed that, "*[t]hanks to our first mover advantage, strong commercial relationships, and preferred position with key veterinary partners,*" competitive activity was "*often reinforcing our leadership,*" and that the Company expected these beneficial dynamics "*to continue for the foreseeable future.*" The Individual Defendants also represented that Simparica Trio "*has not yet experienced year-over-year patient share loss since competition launched almost two years ago,*"

that it "*remains the market leader in the tripe combination space,*" and that the Company continues to see "*minimal patient share impact due to competition*" in dermatology.

116. Additionally, during the Q2 2025 Earnings Call, the Individual Defendants emphasized that the Company "*continues to deliver,*" and that it had "*create[ed] the Derm category.*" The Individual Defendants further touted that Apoquel and Cyopoint "*help vets personalize care, improve compliance, and deliver high satisfaction, reducing the likelihood of switching, and supporting durable franchise performance.*"

117. The statements contained in ¶¶114-116 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### September 8, 2025 Morgan Stanley Global Healthcare Conference

118. On September 8, 2025, Defendants Peck and Joseph represented Zoetis at the Morgan Stanley Global Healthcare Conference. When asked about Simparica Trio's market share, Defendant Joseph stated:

> Simparica Trio, first to market in the US with their triple combination back in 2020. And that first to market advantage plus very high level of satisfaction is why *we've been very confident that with competition*, which, by the way, happens in parasiticides as new competitors come into a standard of care, they actually help drive the expansion of that market, which is what we're seeing. We knew that would happen. And certainly, in the first year, almost two years now of your competition, you've seen Trio continue to drive strong double-digit growth for us…. And our market share, *we're continuing to gain share in the space*. If you look at where we are, about 45% of the market right now is triple combinations. But puppies are actually seeing 60% of new puppies are getting on triple combinations. *And we live*

*in that space as well with a share I'm hoping that's higher than our overall share*. So, we like the leading indicators that we see here in terms of where we are, in terms of helping to lead the expansion of that space.

119.    Also during the conference, Defendant Joseph was asked about the dermatology market, to which he downplayed the risk of competition facing the Company and expressed confidence in growing the Company's market share. In relevant part, he stated, "*we believe we're well-positioned to continue to lead in the growth and expansion of the market globally, even after competitors come in*."

120.    The statements contained in ¶¶118-119 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### November 4, 2025 Press Release and Earnings Call

121.    The truth continued to emerge on November 4, 2025 when the Company issued a press release announcing its financial results for the period ended September 30, 2025 ("Q3 2025 Press Release"). The Q3 2025 Press Release showed slowing growth across the Company's Companion Animal Portfolio and revealed that the Company was lowering full year sales outlook. The Q3 2025 Press Release also disclosed that Zoetis experienced "a decline in the company's monoclonal antibody (mAb) products for osteoarthritis (OA) pain, Librela® for dogs . . ." The Q3 2025 Press Release further reported that the Company experienced increased competitive pressure in its dermatology and parasiticides segments.

122.    On this news, Zoetis' stock price fell by $19.89 per share, or approximately 13.8%, from a closing price of $144.10 per share on November 3, 2025, to close at $124.46 per share on November 4, 2025. However, the Individual Defendants continued to obfuscate the truth surrounding Zoetis' competitive position and long-term growth prospects.

123.    For example, during an earnings call held the same day to discuss the results of the Q3 2025 Press Release (the "Q3 2025 Earnings Call"), the Individual Defendants continued to give positive assurances to investors, stating that Zoetis' "*resilient growth engine remains strong,*" that its "*trusted brands*" continued to "*lead their categories,*" and that Simparica Trio continued to "*set the benchmark in the category.*" The Individual Defendants also asserted that the Company "*continued to navigate a more competitive US market and hold share with discipline and focused execution,*" and that its "*first mover advantage, strong retail presence, and customer loyalty position [Zoetis] well to sustain momentum across the portfolio.*" With respect to dermatology, the Individual Defendants represented that the franchise remained "*resilient,*" and that the Company was "*confident our portfolio will maintain its position as a preferred choice among customers.*"

124.    The statements contained in ¶123 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

*February 12, 2026 Press Release and Earnings Call*

49

125.    The truth continued to emerge on February 12, 2026 when the Company released its results for the quarter and fiscal year ended December 31, 2025 (the "Q4 2025 Press Release"). The Q4 2025 Press Release disclosed that the Company was facing increasing competitive pressures in the parasiticides and dermatology segments.

126.    On this news, Zoetis' stock price fell $3.03 per share, or approximately 2.4%, from a closing price of $128.67 per share on February 11, 2026, to close at $125.64 per share on February 12, 2026. However, the Individual Defendants continued to obfuscate the truth surrounding Zoetis' competitive position and long-term growth prospects.

127.    For example, during an earnings call held the same day to discuss Zoetis' financial results for the fourth quarter and full year 2025 (the "Q4 2025 Earnings Call"), Defendant Peck claimed that the Company continued "*to lead across key brands,*" that Simparica Trio maintained its position as the "*number one selling canine brand*," and that Simarica Trio continued to gain global market share even within "*an increasingly competitive market*." The Individual Defendants further represented that the Company was "*competing from a position of strength,*" and that the dermatology segment of Zoetis's business remained "*durable.*"

128.    Also during the Q4 2025 Earnings Call, Defendant Joseph stated that "*we have not seen any significant impact from competitive pressure*," and that competitors were achieving only a "*very limited impact*." Defendant Peck additionally stated that the Company remained "confident in the long-term strength of Librela."

129.    The statements contained in ¶126-127 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were

losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### March 9, 2026 Leerlink Global Healthcare Conference

130. On March 9, 2026, Defendant Joseph attended the Leerlink Global Healthcare Conference on behalf of the Company. During the conference, Defendant Joseph downplayed the competitive pressures in the parasiticides market when asked about the growth of Simparica Trio. Specifically, Defendant Joseph stated:

> We think there's still a lot more room to expand into triple combinations in some instances, *where competitors have launched products, they're just ramping up and therefore are cannibalizing some of their legacy sort of achievements in the process*. But overall, *there's significant room here for this market to keep expanding.*

131. Regarding Librela, Defendant Joseph explained that the product was stabilizing based on satisfaction levels from veterinarians. Specifically, Defendant Joseph stated, in pertinent part:

> We have a multi-pronged strategy we continue to execute on and gaining more and more confidence in terms of how that's working, given what we're seeing, which we've described on the last couple of calls in terms of *seeing stabilizing effects*. And they come by the way of sort of the *sequential rolling four-week, five-week trends we're seeing in terms of sales, as well as we gauge veterinarians on a regular basis around where their satisfaction levels are, intent to prescribe, and all those things*. And we've seen those elevate from their previous lows to a point where we see the *combination of those signaling the stabilization of this product*.

132. The statements contained in ¶¶130-131 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As

a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Fully Emerges**

*May 7, 2026 Press Release and Earnings Call*

133.    The truth fully emerged on May 7, 2026 when the Company issued the Q1 2026 Press Release. The Q1 2026 Press Release revealed that the Company was reducing its full year guidance and that there had been significant deterioration across the Company's Companion Animal Portfolio. The Q1 2026 Press Release also revealed slowing overall revenue growth, declining sales performance across the Companion Animal Portfolio, and worsening results across key dermatology and parasiticide franchises. Specifically, the Q1 2026 Press Release quoted Defendant Peck as stating, in relevant part:

> Pet owners demonstrated increased price sensitivity, resulting in a decline in veterinary visits and softer demand for premium innovative products, where Zoetis leads. At the same time, competition intensified across key pet care categories, including dermatology and parasiticides. We are taking decisive action to sharpen commercial execution, unlock revenue and continue to drive disciplined cost management.

134.    On the same day, the Company held an earnings call to discuss its financial results for the first quarter of 2026 (the "1Q 2026 Earnings Call"). During the 1Q 2026 Earnings Call, Defendant Joseph stated that "[c]onsumer sentiment is pressuring aspects of pet owner spend in several key markets as we are facing increased competition globally for Apoquel and despite our strong label, price has played a larger role in the decision process." Defendant Joseph further stated that "[s]hare loss is being amplified by a derm[atology] market with declining patient volume in the clinic." The Individual Defendants also stated that there was contraction in the parasiticides segment and that the Company was operating in a "more price sensitive and competitive environment."

135.    On this news, Zoetis' stock price fell $23.91 per share, or approximately 21.5%, from a closing price of $111.22 per share on May 6, 2025, to close at $87.31 per share on May 7, 2026.

## REPURCHASES DURING THE RELEVANT PERIOD

136.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $3.8 billion to repurchase more than 28.7 million shares of its own common stock at artificially inflated prices between January 2025 and May 2026.

137.    According to the Form 10-Q filed with the SEC on May 6, 2025 for the first quarter of 2025 (the "Q1 2025 10-Q"), between January 1, 2025 and January 31, 2025, the Company purchased 568,767 shares of its own common stock at an average price of $168.27 per share, for a total cost to the Company of approximately $95,706,423.

138.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $46,047,376 for repurchases of its own common stock between January 1, 2025 and January 31, 2025.

139.    According to the Q1 2025 10-Q, between February 1, 2025 and February 28, 2025, the Company purchased 1,341,391 shares of its own common stock at an average price of $163.88 per share, for a total cost to the Company of approximately $219,827,157.

140.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately, the Company overpaid by approximately $102,710,309 for repurchases of its own common stock between February 1, 2025 and February 28, 2025.

141. According to the Q1 2025 10-Q, between the period March 1, 2025 and March 31, 2025, the Company purchased 776,717 shares of its own common stock at an average price of $164.88 per share, for a total cost to the Company of approximately $128,065,099.

142. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $60,249,938 for repurchases of its own stock between March 1, 2025 and March 31, 2025.

143. According to the Form 10-Q filed with the SEC on August 5, 2025 for the second quarter of 2025 (the "Q2 2025 10-Q"), between April 1, 2025 and April 30, 2025, the Company purchased 812,772 shares of its own common stock at an average price of $151.49 per share, for a total cost to the Company of approximately $123,126,830.

144. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $52,163,707 for repurchases of its own common stock between April 1, 2025 and April 30, 2025.

145. According to the Q2 2025 10-Q, between May 1, 2025 and May 31, 2025, the Company purchased 536,803 shares of its own common stock at an average price of $158.86 per share, for a total cost to the Company of approximately $85,276,525.

146. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $38,408,255 for repurchases of its own common stock between May 1, 2025 and May 31, 2025.

147. According to the Q2 2025 10-Q, between June 1, 2025 and June 30, 2025, the Company purchased 790,031 shares of its own common stock at an average price of $162.72 per share, for a total cost to the Company of approximately $128,553,844.

148.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $59,576,238 for repurchases of its own common stock between June 1, 2025 and June 30, 2025.

149.    According to the Form 10-Q filed with the SEC on November 4, 2025 for the third quarter of 2025 (the "Q3 2025 10-Q"), between July 1, 2025 and July 31, 2025, the Company purchased 708,949 shares of its own common stock at an average price of $153.69 per share, for a total cost to the Company of approximately $108,958,372.

150.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $47,060,035 for repurchases of its own common stock between May 1, 2025 and May 31, 2025.

151.    According to the Q3 2025 10-Q, between August 1, 2025 and Augst 31, 2025, the Company purchased 967,582 shares of its common stock at an average price of $151.21 per share, for a total cost to the Company of approximately $146,308,074.

152.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $61,828,490 for repurchases of its own common stock between August 1, 2025 and August 31, 2025.

153.    According to the Q3 2025 10-Q, between September 1, 2025 and September 30, 2025, the Company purchased 813,231 shares of its own common stock at an average price of $149.64 per share, for a total cost to the Company of approximately $121,691,887.

154.    As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $50,688,688 for repurchases of its own common stock between September 1, 2025 and September 30, 2025.

155.   According to the Form 10-K filed with the SEC on February 12, 2026 (the "2026 10-K"), between October 1, 2025 and October 31, 2025, the Company purchased 773,904 shares of its own common stock at an average price of $144.58 per share, for a total cost to the Company of approximately $111,891,040.

156.   As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $44,321,482 for repurchases of its own common stock between October 1, 2025 and October 31, 2025.

157.   According to the 2026 10-K, between November 1, 2025 and November 30, 2025, the Company purchased 2,342,306 shares of its own common stock at an average price of $121.99 per share, for a total cost to the Company of approximately $285,737,909.

158.   As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $81,231,172 for repurchases of its own common stock between November 1, 2025 and November 30, 2025.

159.   According to the 2026 10-K, between December 1, 2025 and December 31, 2025, the Company purchased 13,449,877 shares of its own common stocks at an average price of $123.54 per share, for a total cost to the Company of approximately $1,661,597,805.

160.   As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $487,289,044 for repurchases of its own common stock between December 1, 2025 and December 31, 2025.

161.   According to the Form 10-Q filed with the SEC on May 7, 2026 for the first quarter of 2026(the "Q1 2026 10-Q"), between January 1, 2026 and January 31, 2026, the Company purchased 2,621,747 shares of its own common stock at an average price of $125.96 per share, for a total cost to the Company approximately $330,235,252.

162. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $101,330,522 for repurchases of its own common stock between January 1, 2026 and January 31, 2026.

163. According to the Q1 2026 10-Q, between February 1, 2026 and February 28, 2026, the Company purchased 972,319 shares of its own common stock at an average price of $127.11 per share, for a total cost to the Company of approximately $123,591,468.

164. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $38,698,296 for repurchases of its own common stock between February 1, 2026 and February 28, 2026.

165. According to the Q1 2026 10-Q, between March 1, 2026 and March 31, 2026, the Company purchased 1,239,070 shares of its own common stock at an average price of $121.40 per share, for a total cost to the Company of approximately $150,423,098.

166. As the Company's common stock was actually worth only $87.31 per share, the price at closing on May 7, 2026, the Company overpaid by approximately $42,239,896 for repurchases of its own common stock between March 1, 2026 and March 31, 2026.

167. Thus, the Company overpaid for repurchases of its own common stock by approximately $1.3 billion between January 2025 and May 2026.

### DAMAGES TO ZOETIS

168. As a direct and proximate result of the Individual Defendants' conduct, Zoetis will lose and expend many millions of dollars.

169. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

170. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

172. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by two of the Individual Defendants.

173. Furthermore, such losses include the Company's overpayment of approximately $1.3 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

174. As a direct and proximate result of the Individual Defendants' conduct, Zoetis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

175. Plaintiff brings this action derivatively and for the benefit of Zoetis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Zoetis, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

176.    Zoetis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

177.    Plaintiff is, and has been at all relevant times, a shareholder of Zoetis. Plaintiff will adequately and fairly represent the interests of Zoetis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

178.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

179.    A pre-suit demand on the Board of Zoetis is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Reed, Stetter (the "Director Defendants") and non-party Stephanie Tilenius (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

180.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director Defendants unable

59

to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

181.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Zoetis to issue materially false and misleading statements. Specifically, the Director Defendants caused Zoetis to issue false and misleading statements which were intended to make Zoetis appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

182.   Additional reasons that demand on Defendant Peck is futile follow. Defendant Peck has served as the Company's CEO since January 2020 after joining the Board in October 2019. As such, the Company provides Defendant Peck with her principal occupation for which she receives lucrative compensation. Thus, as the Company admits, she is a non-independent director. As the Company's highest officer, she conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Additionally, Defendant Peck solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed, and herself, to the Board for

a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. Also, Defendant Peck's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate her motive in facilitating and participating in the schemes. Furthermore, Defendant Peck is a defendant in the Securities Class Action. For these reasons, Defendant Peck breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

183.     Additional reasons that demand on Defendant Bisaro is futile follow. Defendant Bisaro has served as a Company director since May 2015 and also serves as a member of the Corporate Governance Committee and the Quality and Innovation Committee. Defendant Bisaro receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Bisaro failed to correct the false and misleading statements alleged herein. Additionally, Defendant Bisaro solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed, and himself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Bisaro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

184. Additional reasons that demand on Defendant Broadhurst is futile follow. Defendant Broadhurst has served as a Company director since July 2022 and also serves as a member of the Corporate Governance Committee and the Quality and Innovation Committee. Defendant Broadhurst receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. During the Relevant Period, Defendant Broadhurst failed to correct the false and misleading statements alleged herein. Additionally, Defendant Broadhurst solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed, and herself to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Broadhurst breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

185. Additional reasons that demand on Defendant D'Amelio is futile follow. Defendant D'Amelio has served as a Company director since July 2012. He also serves as the Chair of the Human Resources Committee and as a member of the Audit Committee. Defendant D'Amelio receives a sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect

corporate assets. During the Relevant Period, Defendant D'Amelio failed to correct the false and misleading statements alleged herein. Additionally, Defendant D'Amelio solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed, and himself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant D'Amelio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

186. Additional reasons that demand on Defendant Hattersley is futile follow. Defendant Hattersley has served as a Company director since April 2024. He also serves as the Chair of the Corporate Governance Committee and as a member of the Audit Committee. Defendant Hattersley receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Hattersley failed to correct the false and misleading statements alleged herein. Additionally, Defendant Hattersley solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Khosla, Leatherberry, McCallister, Norden, Parent, Reed, and himself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Hattersley breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

187.    Additional reasons that demand on Defendant Khosla is futile follow. Defendant Khosla has served as a Company director since June 2013 and also serves as a member of the Human Resources Committee and the Quality and Innovation Committee. Defendant Khosla receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Khosla failed to correct the false and misleading statements alleged herein. Additionally, Defendant Khosla solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Leatherberry, McCallister, Norden, Parent, Reed, and himself to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Khosla breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

188.    Additional reasons that demand on Defendant Leatherberry is futile follow. Defendant Leatherberry has served as a Company director since December 2020 and also serves as a member of the Audit Committee and the Human Resources Committee. Defendant Leatherberry receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any oversight into the schemes to cause the Company to

make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. During the Relevant Period, Defendant Leatherberry failed to correct the false and misleading statements alleged herein. Additionally, Defendant Leatherberry solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, McCallister, Norden, Parent, Reed, and herself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Leatherberry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

189.    Additional reasons that demand on Defendant McCallister is futile follow. Defendant McCallister has served as a Company director since January 2013 and as Chairman of the Board since June 2013. Defendant McCallister receives sizable compensation for his role as Chairman. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant McCallister failed to correct the false and misleading statements alleged herein. Additionally, Defendant McCallister solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, Norden, Parent, Reed, and himself to the Board for a one-year term, thereby allowing them to continue

65

breaching their fiduciary duties to the Company. For these reasons, Defendant McCallister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

190. Additional reasons that demand on Defendant Norden is futile follow. Defendant Norden has served as a Company director since January 2013. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance Committee. Defendant Norden receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Norden failed to correct the false and misleading statements alleged herein. Additionally, Defendant Norden solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Parent, Reed, and himself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Norden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

191. Additional reasons that demand on Defendant Reed is futile follow. Defendant Reed has served as a Company director since March 2014. He also serves as the Chair of the Quality and Innovation Committee and as a member of the Corporate Governance Committee. Defendant Reed receives sizable compensation for his role as a Company director. As a trusted

Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, he failed to correct the false and misleading statements alleged herein. Additionally, Defendant Reed solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to elect Defendant Stetter and to re-elect Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and himself to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Reed's insider sale while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, Defendant Reed breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

192.    Additional reasons that demand on Defendant Stetter is futile follow. Defendant Stetter has served as a Company director since May 2025. He also serves as a member of the Human Resources Committee and Quality and Innovation Committee. Defendant Stetter receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Stetter breached his fiduciary duties, faces

a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

193. Additional reasons that demand on the Board is futile follow.

194. Defendants Norden (as Chair), D'Amelio, Hattersley, and Leatherberry (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

195. Defendants Reed (as Chair), Bisaro, Broadhurst, Khosla, and Stetter (collectively, the "Quality and Innovation Committee Defendants") served as members of the Quality and Innovation Committee at all relevant times. As such, they were responsible for the Company's compliance with processes and internal controls relating to health and safety programs, and oversight of the Company's programs with respect to product safety and animal welfare. During the Relevant Period, they violated the Quality and Innovation Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading

statements to the public downplaying the impact of the FDA Letter; failed to adequately oversee the Company's product safety and animal welfare programs; and failed to ensure adequate internal controls relating to Zoetis' health and safety programs. Thus, the Quality and Innovation Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

196.   In violation of the Code of Conduct, the Director Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

197.   Zoetis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Zoetis any part of the damages Zoetis suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

198.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

199. The acts complained of herein constitute violations of fiduciary duties owed by Zoetis' officers and directors, and these acts are incapable of ratification.

200. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zoetis. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Zoetis, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

201. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Zoetis to sue the Individual Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

202.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six of the Current Board, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of**
**Section 20(a) of the Exchange Act**

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    The Individual Defendants, by virtue of their positions with Zoetis and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Zoetis and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Zoetis to engage in the illegal conduct and practices complained of herein.

205.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Exchange Act**

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Zoetis. Not only is Zoetis now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Zoetis by the Individual

71

Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Zoetis.

208.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

209.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Zoetis not misleading.

210.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Zoetis.

211.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

212.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

213.   Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## THIRD CLAIM
**Against Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed for Violations of Section 14(a) of the Exchange Act**

214.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

216.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

217.   Under the direction and watch of Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed, the 2025 Proxy

Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

218.    The 2025 Proxy Statement was also materially misleading because it failed to disclose that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2) Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed caused the Company's public statements to be materially false and misleading at all relevant times.

219.    Defendants Peck, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, and Reed knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

220.    The false and misleading statements in the 2025 Proxy Statement caused Company shareholders to vote, *inter alia*: (1) to elect Defendant Stetter and re-elect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Reed to the

Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executives; and (3) the ratification of the KPMG as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2025.

221.    The Company was damaged as a result of Defendant Peck's, Bisaro's, Broadhurst's, D'Amelio's, Hattersley's, Khosla's, Leatherberry's, McCallister's, Norden's, Parent's, and Reed's material misrepresentations and omissions in the 2025 Proxy Statement.

222.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zoetis' business and affairs.

225.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zoetis.

227.    In breach of their fiduciary duties owed to Zoetis, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Zoetis' Librela significantly fell out of favor amongst veterinarians following a safety warning issued by the FDA; and (2)

Zoetis' leading products within its Companion Animal Portfolio, namely Simparica Trio, Apoquel, and Cytopoint, were losing substantial market share to newly launched and lower-priced competing products. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

228.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

229.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls.

230.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2.8 million across them.

231.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

232.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain

adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

233.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zoetis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zoetis.

238.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Zoetis that was tied to the performance or artificially inflated valuation of Zoetis or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

239.    Plaintiff, as a shareholder and a representative of Zoetis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

240.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zoetis, for which they are legally responsible.

243.    As a direct and proximate result of the Individual Defendants' abuse of control, Zoetis has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

244.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zoetis in a manner consistent with the operations of a publicly held corporation.

247.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zoetis has sustained and will continue to sustain significant damages.

248.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

252.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

253.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Zoetis to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

254.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

255.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Peck and Joseph for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.     Zoetis and Defendants Peck and Joseph are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Peck's and Joseph's willful and/or reckless violations of their obligations as officers and/or directors of Zoetis.

258.     Defendants Peck and Joseph, because of their positions of control and authority as officers and/or directors of Zoetis, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zoetis, including the wrongful acts complained of herein and in the Securities Class Action.

259.     Accordingly, Defendants Peck and Joseph are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

260.     As such, Zoetis is entitled to receive all appropriate contribution or indemnification from Defendants Peck and Joseph.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Zoetis, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zoetis;

(c)     Determining and awarding to Zoetis the damages sustained by it as a result

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Zoetis and the Individual Defendants to take all necessary actions to reform and improve Zoetis' corporate governance and internal procedures to comply with applicable laws and to protect Zoetis and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zoetis to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Zoetis restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2026                              Respectfully Submitted,

81

82

**THE BROWN LAW FIRM, P.C.**


*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Zachary Benson
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: zbenson@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

I, Kristen Augitto, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of June 2026.

DocuSigned by:

AEF17652C4214D6...

Kristen Augitto